# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

MERCY HEALTH SERVICES-INC,
MERCY HEALTH SERVICES-IOWA,
CORP., d/b/a MERCYONE
SIOUXLAND MEDICAL CENTER,

        Plaintiffs,

vs.

STILIANOS EFSTRATIADIS, M.D.,

        Defendant.

No. 21-CV-4052-CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

## TABLE OF CONTENTS

I.     BACKGROUND ............................................................................. 3

II.    PRELIMINARY INJUNCTION STANDARD ....................................... 6

III.   ANALYSIS................................................................................... 7

     A.    Irreparable Harm................................................................. 7

         1.    Arguments ................................................................. 7

         2.    Applicable Law ........................................................... 8

         3.    Analysis ..................................................................... 9

            a.    Goodwill ........................................................... 9

            b.    Reputation ........................................................12

          c.      Money Damages ....................................................15

B.      Likelihood of Success on the Merits ............................................16

      1.      Arguments ........................................................16

      2.       Applicable Law.....................................................18

      3.      Analysis ..........................................................20

          a.      Patient Inducement .............................................20

          b.      Noncompete Clause .............................................22

          c.      Equitable Estoppel...............................................24

C.      Balance of Harms ...................................................26

      1.      Arguments ........................................................26

      2.      Applicable Law ....................................................26

      3.      Analysis ..........................................................27

D.      Public Interest .......................................................30

      1.      Arguments ........................................................30

      2.      Applicable Law ....................................................31

      3.      Analysis ..........................................................31

IV.     CONCLUSION ............................................................33

This matter is before the Court on plaintiffs' Motion for Preliminary Injunction. (Doc. 4). The Court held oral argument on December 20, 2021. (Doc. 21). On December 22, 2021, the Court granted plaintiffs' Motion for Preliminary Injunction, doing so in an abbreviated order in the interest of justice. (Doc. 22). The Court writes now to provide more detailed reasoning of its decision.

## I.      BACKGROUND

The Court's factual findings are based on plaintiffs' complaint and the parties' sworn declarations and exhibits submitted in support of their positions. The Court's factual findings here are provisional and not binding in future proceedings. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."); *SEC v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) (same). Affidavits submitted at the preliminary injunction phase need not meet the requirements of affidavits under Rule 56(c)(4), but courts may consider the "competence, personal knowledge and credibility of the affiant" in determining the weight to give the evidence. *Bracco v. Lackner*, 462 F. Supp. 436, 442 n.3 (N.D. Cal. 1978) (citing 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949)). The Court will discuss additional facts as they become relevant to the Court's analysis.

On January 31, 2019, Stilianos Efstratiadis ("defendant") entered into an employment contract ("Employment Agreement) with Mercy Medical Services ("the Mercy Clinic"), which the Employment Agreement referred to as "Employer." (Docs. 1, at 2; 1-1, at 1). Per the Employment Agreement, defendant was to provide cardiology clinic services as an Interventional Cardiology Specialist at the Mercy Clinic, where he would also serve as the head of cardiology. (Doc. 1, at 2–3). The Mercy Clinic is located at the MercyOne Siouxland Medical Center, the operating name of Mercy Health Services-Iowa ("MercyOne" or "Hospital"). (*Id.*, at 1–2). Thus, defendant's primary

practice location was at the Hospital on 801 Fifth Street, Sioux City, Iowa 51101. (*Id.*, at 4). When Mercy Clinic patients require hospital procedures, clinicians refer them to the Hospital. (*See* Docs. 17, at 18, 20; 20, at 4); (*see also* Doc. 1-1, at (Employment Agreement, Article I. Physician Duties, Section C. Mandatory Referrals and Exceptions). Still, the Employment Agreement expressly provides that it has no intended beneficiaries. (Doc. 1-1, at 11 (Employment Agreement, Article XIII. Miscellaneous, Section G. Enforceability)).

The Employment Agreement contains a Covenants section that enumerates future actions defendant agreed *not* to take in exchange for his employment at the Mercy Clinic. (Doc. 1-1, at 9). Among others, the Covenants provisions include: (1) an agreement not to induce Mercy Clinic employees to leave their employment with the Mercy Clinic; (2) an agreement not to induce Mercy Clinic patients to discontinue services from the Mercy Clinic; and (3) an agreement not to compete ("noncompete clause") with the Mercy Clinic by "engag[ing] in a similar position within [the Mercy Clinic's] service area, as defined in Addendum F, without the express written consent of [the Mercy Clinic]." (*Id.*). Each of these covenants lasted for twelve months after the Employment Agreement's term. (*Id.*). Addendum F defined the noncompete clause's service area to extend forty miles, as the crow flies, from the physician's primary practice location. (*Id.*, at 26). Thus, for defendant, the service area extended forty miles from the Hospital. (*See* Docs. 1, at 3–4; 1-1, at 11).

After hiring defendant, the Mercy Clinic spent significant resources building defendant's practice and advertising his services in the community, including using defendant's photo on advertising billboards and introducing defendant to local primary care providers. (Doc. 1, at 4). Specifically, the Mercy Clinic spent nearly $80,000 to market defendant's practice over two-and-a-half years. (Docs. 6-2, at 1–2; 20-1, at 17).

4

On July 15, 2021, the Mercy Clinic terminated defendant's employment without cause, as permitted by the Employment Agreement. (Docs. 1, at 4; 1-1. at 8 (Employment Agreement, Article C. Termination, Section 1. Termination.); 6, at 6 n.2). Defendant's last day of employment was November 13, 2021. (Doc. 1, at 4). In effect, November 13, 2021 was the final day of the Employment Agreement's term. (*See* Doc. 1-1, at 8).

After being terminated, defendant secured a space 0.4 miles from the Hospital to use as a private cardiology practice. (Doc. 6, at 8). He set up phone lines and computer equipment to service this practice, and engaged a billing company. (*Id.*). He also told other doctors at the Hospital that he would be continuing his practice and that they should call him for patients. (*Id.*).[1] On November 15, 2021, defendant opened his clinic. (Doc. 17, at 37).

Defendant now solicits patients in Sioux City, using both billboards and mailers. Defendant uses a billboard to advertise his cardiology services and share that he is accepting new patients within the Service Area. (Doc. 1, at 5). Defendant first advertised via billboard during his employment term, but agreed to remove that billboard. (*Id.*). But defendant later advertised using "an essentially identical billboard" in another location within the Service Area. (Docs. 1, at 5; 1-2; 1-3). Defendant's photograph, the billboard's feature image, is a photograph that the Mercy Clinic secured and used to advertise him as the head of its cardiology services. (Docs. 1, at 5; 1-2; 1-3). Defendant

---

[1] Plaintiffs also allege that defendant attempted to recruit multiple MercyOne employees and successfully recruited and hired then-MercyOne employee Kristin Sieh from the Hospital to work as his biller and MercyOne employee Khory Von Mock to set up his IT system. (Doc. 1, at 4–5). Defendant asserts that he solicited neither employee and that, in any event, Mr. Von Mock is a Trinity—not MercyOne—employee. (Doc. 17, at 21, 32). The Court does not address plaintiffs' employee solicitation claim in this order because plaintiffs do not seek an injunction based on these alleged violations. (*See* Doc. 1, at 3–4).

has also sent mailers soliciting "follow up appointments" to "continue" cardiology services for his "existing patients." (Doc. 20-1, at 2).

On November 19, 2021, MercyOne and the Mercy Clinic (collectively, "plaintiffs") sued defendant for breach of contract and breach of fiduciary duties. (Doc. 1). As part of the proposed relief on their breach of contract claim, plaintiffs requested that the Court issue an injunction enjoining defendant from violating the Employment Agreement. (*Id.*, at 6). On November 24, 2021, plaintiffs moved for a preliminary injunction. (Doc. 4). Plaintiffs requested that the Court (1) enjoin defendant from soliciting patients, and (2) enjoin defendant from competing with them by offering cardiology clinic services within forty miles of the Mercy Clinic. (*Id.*, at 3–4).

## II.    PRELIMINARY INJUNCTION STANDARD

The requirements for a preliminary injunction are well established:

> When determining whether to issue a preliminary injunction, the district court should consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other party litigants; (3) the probability that movant will succeed on the merits; and (4) the public interest."

*Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC,* 953 F.3d 1041, 1044 (8th Cir. 2020) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). The movant bears the burden of establishing the propriety of a preliminary injunction. *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis original) (quoting 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)). "[T]he burden on the movant is heavy, in particular where . . . 'granting the preliminary injunction will give [the movant] substantially the relief it would obtain after

a trial on the merits.'" *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (second alteration in original) (quoting *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993)).

## III. ANALYSIS

Before beginning its analysis, the Court must address defendant's argument that MercyOne is an inappropriate plaintiff. (Doc. 17, at 6). The Court's order focuses on plaintiff the Mercy Clinic, an undisputed party to defendant's employment contract Employment Agreement. The Court finds that it need not decide at this stage of the litigation whether MercyOne is a proper party to this suit, nor need it decide whether MercyOne will suffer damages, irreparably or otherwise, if the Court does not enter a preliminary injunction. As described below, the Court finds that the Mercy Clinic demonstrates a need for a preliminary injunction. *See Dataphase*, 640 F.2d at 114.

Because the absence of irreparable harm is fatal to a motion for preliminary injunction, the Court will first address the threat of irreparable harm. The Court will then discuss the remaining *Dataphase* factors. *See id*.

### A. Irreparable Harm

The Court finds that Mercy Clinic will suffer irreparable harm absent a preliminary injunction.

#### 1. Arguments

Plaintiffs argue that they have suffered irreparable harm for two reasons. First, plaintiffs argue that defendant solicited Mercy Clinic patients and will continue to compete with the Mercy Clinic absent an injunction, thereby undermining the clinic's customer goodwill. Second, plaintiffs argue that the Court can infer from the facts that the Mercy Clinic will be irreparably harmed unless the Court grants a preliminary injunction. (Doc. 6, at 14–15).

Defendant, however, argues that plaintiffs fail to demonstrate irreparable harm because such harm cannot be inferred and moreover, the harms plaintiffs allege could be adequately remedied by damages or a permanent injunction. (Doc. 17-1, at 22–27). Defendant asserts that plaintiffs admit as much because they seek money damages in their complaint. (*Id.*, at 26).[2] Defendant also argues that plaintiffs' claim that its "customer and employee goodwill are at stake" is a "naked assertion" functionally equivalent to an inference of irreparable harm. (*Id.*, at 25–26).

### 2.    *Applicable Law*

"[T]o warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Wachovia Secs., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1044 (N.D. Iowa 2008) (citation omitted). The movant must show more than the mere possibility that irreparable harm will occur. *TrueNorth Co., L.C. v. TruNorth Warranty Plans of North America, LLC*, 353 F. Supp. 3d 788, 801 (N.D. Iowa 2018). Rather, the movant must show it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Thus, "[s]peculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) ("[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n,* 109 F.3d 418, 425 (8th Cir. 1996))). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a

---

[2] Additionally, defendant asserts that plaintiffs have actually benefitted from his clinic because he refers every patient in need of a hospital procedure to the Hospital. (Doc. 17, at 27). As the Court has already discussed, however, defendant has asserted that the Hospital is not a proper party, and the Court focuses on harms to the Mercy Clinic in this order. Thus, the Court will not consider this argument.

preliminary injunction[.]"  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### 3.    Analysis

Here, the Court finds the Mercy Clinic will suffer irreparable harm absent a preliminary injunction.  The Court declines to infer that the Mercy Clinic will be irreparably harmed by defendant's behavior.  The Eighth Circuit has upheld the inference of irreparable harm in the context of a *permanent* injunction.  *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (finding irreparable harm inferable from a trial court's actual finding of breach for purposes of a permanent injunction).  But irreparable harm cannot be inferred in the context of a *preliminary* injunction, as here.  *TrueNorth Co., L.C.*, 353 F. Supp. 3d at 801.  To do so would flout "Eighth Circuit precedent requiring the movant to demonstrate that the harm that is 'certain and great,' and that failure to show irreparable harm is, by itself, sufficient to deny a preliminary injunction."  *Id.* (citing Eighth Circuit cases) (citations omitted).  Instead, the Court finds the Mercy Clinic shows it will likely face irreparable harm to its goodwill and reputation.

### a.    Goodwill

The Court finds the Mercy Clinic has shown that it will likely suffer irreparable harm to its goodwill unless the Court imposes an injunction.  "Goodwill" is defined as "[a] business's reputation,[3] patronage, and other intangible assets that are considered when appraising the business . . .; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets."  *Goodwill*, BLACK'S LAW DICTIONARY (11th ed. 2019).

---

[3] The Court notes that this definition includes reputation as part of goodwill.  Still, parties and courts sometimes use the terms separately, as plaintiffs do here.  Thus, the Court will examine the Mercy Clinic's goodwill and reputation harms separately.

By advertising his services to his "existing patients" (Doc. 20-1, at 2), defendant is soliciting patients to leave the Mercy Clinic. Defendant's last day of employment at the Mercy Clinic was November 13, 2021. (Docs. 6-3, at 1; 17-1, at 13). As of November 29, 2021, at least ten Mercy Clinic patients requested transfer of their records to defendant's clinic. (Doc. 6, at 14). As of December 17, 2021, an additional thirty-nine patients had requested transfer of their records. (Doc. 20-1, at 20). This harm cannot be fully compensated by monetary damages, as defendant asserts. (Doc. 17-1, at 26).

The Mercy Clinic invested heavily in advertising defendant's services in the Sioux City area, spending nearly $80,000 to market defendant's practice over two-and-a-half years. (Docs. 6-2, at 1–2; 20-1, at 17). That goodwill became the Mercy Clinic's goodwill while defendant worked in its employ. Defendant now exploits the goodwill he achieved with Mercy Clinic patients, at the Mercy Clinic's expense, to compete with the Mercy Clinic and to solicit its patients. In doing so, defendant is undermining the Mercy Clinic's customer goodwill, and that loss extends beyond tangible profits. Indeed, this intangible loss is a form of irreparable harm. *See TrueNorth Cos., L.C., LLC*, 353 F. Supp. 3d at 800 (citation omitted).

The Court disagrees with defendant's argument that plaintiffs' assertion that their goodwill will be irreparably harmed is the functional equivalent of inference. Plaintiffs' argument is not as stripped of details and evidence as defendant purports it to be. (*See* Doc. 6, at 14–15). Plaintiffs cite several cases within the Eighth Circuit and before this Court in which courts found that allowing a former employee to solicit clients resulted in irreparable injury. (*Id.*). But plaintiffs also state that the Mercy Clinic's investment in defendant and his practice developed his reputation and goodwill, which he now exploits by soliciting those patients to his clinic and advertising his services using a photograph secured by the Mercy Clinic and associated with their services. (*Id.*).

10

To the extent defendant argues plaintiffs needed to include evidence that goodwill loss of customers is unquantifiable, precedent indicates otherwise. A review of the relevant case law shows that in the context of a plaintiff's valid agreement not to compete with a defendant, Eighth Circuit courts have found irreparable harm when a defendant affirmatively solicits business from a plaintiff's customers or clients. *See, e.g.*, *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) ("If the noncompete agreements are valid, then we think an irreparable injury has been shown."); *Moore Bus. Forms, Inc. v. Wilson*, 953 F. Supp. 1056, 1062–63 (N.D. Iowa 1996) ("If the restrictive covenants at issue prove to be valid and enforceable, continued violation of the covenants will cause the plaintiff to suffer some irreparable harm to goodwill and its established relationships."); *Pro Edge, L.P. v. Gue*, 374 F. Supp. 771, 749–50 (N.D. Iowa 2005) (collecting cases). *Cf. Mgmt Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183–83 (8th Cir. 2019) (finding irreparable harm not shown when plaintiff's evidence showed its losses due to lost clients were quantifiable and plaintiff "ask[ed] the district court to trust its assessments that [other] harms [we]re unquantifiable"); *Fialkoff v. VGM Grp., Inc.*, No. 19-CV-2041 CJW, 2019 WL 5103813, at *6 (N.D. Iowa Oct. 11, 2019) (finding irreparable harm not shown when plaintiffs sufficiently pled difficulty retaining clients but failed to demonstrate harm beyond possible "expenses and difficulties").

This showing is different, however, than simply inferring irreparable harm. In each case, the plaintiff showed the defendant's affirmative solicitation of its clients. *N.I.S. Corp*, 724 F.2d at 710 (citing the "district court['s finding] that the individual defendants were each affirmatively soliciting business from holders of [plaintiff's] policies" as evidence supporting a finding of irreparable injury); *Moore Bus. Forms*, 953 F. Supp. at 1062–63 (citing evidence establishing plaintiff's past business and defendant's past role conducting that business for plaintiff as establishing a risk that, absent an injunction preventing further competition, defendant will erode plaintiff's goodwill); *Pro*

*Edge, L.P. v. Gue*, 374 F. Supp. 771, 749–50 (N.D. Iowa 2005) (citing evidence establishing that defendant provided medical services to plaintiff's patients, within service area, and would continue to do so absent an injunction).

Moreover, as the Eighth Circuit has stated, a district court may find, within its discretion, "a likelihood of irreparable harm based on general principles." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (2009). If the movant "show[s] that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief," then a district court may properly find irreparable harm. *See Novus Franschising*, 725 F.3d at 895.

The Court finds that the Mercy Clinic has shown irreparable harm here. The Mercy Clinic has shown both defendant's breach of a valid noncompete clause by affirmative solicitation of its patients and general principles supporting a likelihood of irreparable harm. As described, the Mercy Clinic's evidence shows that defendant is affirmatively soliciting business from its customers, supported by photographs of defendant's billboards, and Daughtery's and Hughes' declarations. Further, the parties do not dispute the validity and enforceability of the Employment Agreement and noncompete clause. Thus, the Court finds that the Mercy Clinic has shown that plaintiffs face an ongoing threat of irreparable injury.

### b. *Reputation*

The Court also finds the Mercy Clinic shows a likelihood of reputational harm absent the issuance of an injunction.[4]

The parties say little about reputation as compared to goodwill. The Court assumes, therefore, that they view harm to reputation as proven by the same acts that

---

[4] Plaintiffs also briefly mention irreparable harm to the Mercy Clinic's "brand" in their reply (Doc. 20, at 16), but do not mention their brand in their original briefing. Thus, per Local Rule 7g, the Court cannot consider this argument. Nevertheless, the Court views this harm as adequately represented in the Mercy Clinic's goodwill and reputation harms.

show harm to goodwill, which is a common understanding. Courts seem to routinely find as much, grouping the two irreparable harms together. *See, e.g.*, *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (affirming district court finding of irreparable harm to both goodwill and reputation based on the same evidence); *Smithfield Packaged Meats Sales Corp. v. Dietz & Watson, Inc.*, 452 F. Supp. 3d. 843, 864 (S.D. Iowa 2020) (same). *See also Gen. Motors Corp.*, 563 F.3d at 319–20 (affirming the district court finding of no irreparable harm to either goodwill or reputation based on the same evidence).

In the business context, reputation is "[t]he public's evaluation of and regard for the quality of a company's goods or services." *Reputation–Business reputation*, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, reputation relates to the public's evaluation of a business, which is slightly different from goodwill, which relates to the business's overall intangible value.[5]

Eighth Circuit case law on reputation as an irreparable injury in the business context is sparse as compared to the caselaw on goodwill. What is sure, however, is that loss of professional reputation can constitute an irreparable injury. *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002). Still, a plaintiff must show that an irreparable loss of reputation will likely occur. For instance, a court might properly find irreparable harm when a plaintiff's Vice President of Retail testifies that "losing customers—and thus market share—harms [the plaintiff]'s brand, goodwill, and reputation." *Smithfield*, 452 F. Supp. 3d. at 847, 864. On the other hand, a court might properly find no irreparable harm to reputation when a plaintiff's evidence shows only

---

[5] Admittedly, one could view goodwill—a business's overall intangible value—as inclusive of reputation—the public's evaluation of a business, or exclusive. As above, *arguendo*, the Court considers the two harms as exclusive.

that "its affiliates have acknowledged the presence of another entity" with a very similar name and faces no likely future harm. *TrueNorth*, 353 F. Supp. at 803–804.

The evidence here is somewhere in between *Smithfield* and *TrueNorth*. Plaintiffs cite no testimony or specific evidence in support of their argument that their reputational harm is irreparable. Instead, plaintiffs seem to argue reputation as an extension of goodwill. The two are always mentioned in conjunction. (Docs. 6, at 14; 20, at 16). Defendant does not raise any specific objections to plaintiffs' alleged reputational harm. In fact, he does not mention the word "reputation" in his argument.

In the absence of clearer argument by the parties, the Court relies solely on the Eighth Circuit's direction that a district court may find, within its discretion, "a likelihood of irreparable harm based on general principles," *Gen. Motors Corp.*, 563 F.3d at 319, so long as that harm is "certain and great" and "there is a clear and present need for equitable relief." *See Novus Franchising*, 725 F.3d at 895. In the context of a noncompete clause, this Court has found that evidence likely showing a violation of a noncompete clause "suffices to show irreparable harm, because violation of such covenants involves much the same threat to goodwill and business relationships with customers as violation of a covenant not to compete." *Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1029–31 (N.D. Iowa 2010). Importantly, this same evidence can show a likelihood of multiple irreparable harms—specifically, loss of goodwill and loss of business reputation. *See id.*, at 1026, 1031.

The Court finds that the Mercy Clinic has shown a likelihood of irreparable harm to its reputation here. As in *Prudential Ins.*, *id.*, the same evidence that shows a likelihood of loss of goodwill shows a likelihood of loss of reputation. Specifically, evidence likely showing that defendant violated his noncompete clause with the Mercy Clinic suffices to show irreparable harm. The Mercy Clinic invested heavily to build defendant's reputation in the area, spending nearly $80,000 to market defendant's

practice over two-and-a-half years. (Docs. 6-2, at 1–2; 20-1, at 17). That reputation became the Mercy Clinic's reputation while defendant worked in its employ. Defendant now exploits that reputation, achieved at the Mercy Clinic's expense, to compete with the Mercy Clinic and to solicit its patients. In doing so, defendant is undermining the Mercy Clinic's reputation, and that loss extends beyond tangible profits. Thus, the Court finds that the Mercy Clinic has shown a likelihood of irreparable harm to its reputation.

### c. *Money Damages*

Plaintiffs' request for money damages does not preclude the Court's issuance of a preliminary injunction, as defendant suggests. Here, plaintiffs allege that some of the Mercy Clinic's harms stemming from defendant's alleged breach of contract might be relieved by money damages. (Doc. 1, at 6). Others, however, including the loss of goodwill and loss of reputation, cannot. (Doc. 6, at 14–15; 20, at 14–20). It is these other harms that the Mercy Clinic cites for why it needs a preliminary injunction. (Doc. 6, at 14–15; 20, at 14–20). The Court will not deny a necessary injunction simply because other relief offers an imperfect remedy. Further, in *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, the case defendant cites for this proposition, the plaintiff admitted that "any harm it may suffer in the form of lost customers and lost profits [wa]s quantifiable and compensable with money damages." 970 F.3d 1010, 1020 (8th Cir. 2020). Specifically, the Eighth Circuit noted that plaintiff estimated its loss for "three longtime customers" at "$580,000 annually." *Id.* Effectively, the *MPay* plaintiff admitted its harm was not irreparable. *Id.* Here, plaintiffs make no comparable assertion or admission and provide no comparable estimates for patients lost to defendant's solicitation and competition. Thus, although money damages may be appropriate for other portions of plaintiffs' breach of contract claim, the Court does not find that this precludes the necessity for a preliminary injunction here.

Having found that plaintiffs have shown they are likely to suffer irreparable harm, the Court now turns to the remaining *Dataphase* factors.

### B. Likelihood of Success on the Merits

The Court finds that the Mercy Clinic meets its burden to show a likelihood of success on the merits.

#### 1. Arguments

Plaintiffs argue that they are likely to succeed on the merits. First, plaintiffs argue that the Employment Agreement's covenants are enforceable because they are reasonably necessary to protect plaintiffs' business and do not unreasonably restrict defendant's rights. (Doc. 6, at 10–13). Second, plaintiffs argue that defendant breached the Employment Agreement's covenants in several ways. (*Id.*, at 13–14). Relevant to their request for a preliminary injunction, plaintiffs assert that (1) defendant solicited Mercy Clinic patients to leave the Mercy Clinic for his clinic; and (2) defendant opened a competing clinic in violation of his noncompete clause.[6] (*Id.*).

Defendant, however, argues only that he did not breach the Employment Agreement and its covenants. (Doc. 17-1, at 30–31). First, defendant argues that no breach occurred because he did not induce patients to leave the hospital. (*Id.*, at 32–33).

Second, defendant argues that he did not breach his noncompete clause because he did not engage in a "similar position" to his work as the head of a cardiology department

---

[6] Plaintiffs also assert that defendant solicited their employees to work with him, and encouraged other physicians to refer their patients to his clinic. (Doc. 6, at 13–14). These claims, however, are not relevant to plaintiffs' requested injunctive relieve, which is specifically to enjoin defendant from violating the noncompete clause and patient inducement covenants of his Employment Agreement. Thus, the Court will not address them—or defendant's arguments in response—here.

Moreover, plaintiffs' employee solicitation allegations include employees of plaintiffs other than the Mercy Clinic. (*See id.*). As previously explained, the Court will only consider the harms to the Mercy Clinic in this order.

at the Mercy Clinic by practicing interventional cardiology in his own private clinic. (*Id.*, at 33–36). Defendant argues that Iowa state courts find a doctor's breach of a noncompete clause only when the doctor agreed not to practice either medicine generally or a particular type of medicine specifically within a define area, and nevertheless did so. (*Id.*, at 35). Here, defendant argues that no Iowa state court would find defendant breached the noncompete clause in his Employment Agreement because it hinged on similarity of position, not his practice of medicine—whether generally or of a particular type. (*Id.*). Further, defendant argues that the Employment Agreement's language shows that plaintiffs recognized the distinction between "practice" and "similar position," especially because the Employment Agreement explicitly referenced "practice" in another context. (*Id.*, at 35–36).

Third, defendant argues that plaintiffs cannot enforce the noncompete clause due to equitable estoppel. (*Id.*, at 36–38). Defendant asserts that the Hospital's Vice President of Operations and Strategic Planning,[7] Tim Daugherty, told him that he still had hospital privileges and could open a practice within the service area. (*Id.*, at 37). Defendant asserts that Daugherty even suggested a building within walking distance of the Mercy Clinic as a possible location for defendant's future private clinic. (*Id.*). Further, defendant asserts that Daugherty said that defendant could refer his patients' procedures to the Hospital, and that those referrals would not be considered competition. (*Id.*). And yet, defendant asserts, three days later after he opened his clinic, Daugherty told him he would have his privileges revoked if he referred patients to the Hospital, and the next day, plaintiffs filed their complaint. (*Id.*).

_____

[7] Defendant refers to Mr. Daugherty as the Hospital's Chief Operating Officer (Doc. 17, at 37), while plaintiffs and Mr. Daugherty himself refer to Mr. Daugherty as the Hospital's Vice President of Operations and Strategic Planning (Doc. 6, at 6-3, at 1; 20-1, at 15). The Court finds this distinction inconsequential, but will use the title that plaintiffs and Mr. Daugherty use.

Plaintiffs' reply, however, undermines defendant's arguments. First, plaintiffs provide a declaration by Daugherty in which he states that he never told defendant that he would support defendant's competing practice. (Doc. 20-1, at 15–16). Instead, Daugherty states that he informed defendant that he expected the Mercy Clinic would enforce its Employment Agreement's covenants by suing defendant if he violated them. (*Id.*). Further, Daugherty—a Hospital employee—asserts that he does not have the authority to waive the Mercy Clinic's rights. (Doc. 20, at 12; 20-1, at 15–16). Second, plaintiffs argue that defendant's previous letter asking them not to enforce the covenants shows that he knew Daugherty did not waive them and therefore could not justifiably rely on Daugherty's words. (Doc. 20, at 12–13).

### 2. Applicable Law

The Eighth Circuit has rejected the notion that the phrase "probability of success on the merits" should be read to mean that a movant can "prove a greater than fifty [percent] likelihood that he will prevail on the merits." *Dataphase Sys., Inc.*, 640 F.2d at 113. More recently, the Eighth Circuit has explained that in cases not seeking to enjoin "government action based on presumptively reasoned democratic processes," courts should "apply the familiar 'fair chance of prevailing' test" to assess whether a movant has a likelihood of success on the merits. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008). The "fair chance of prevailing" test "asks only whether a movant has demonstrated a 'fair chance of prevailing' in the ultimate litigation and . . . does not require a strict probabilistic determination of the chances of a movant's success when other factors, for example irreparable harm, carry substantial weight." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053–54 (8th Cir. 2014) (citations omitted).

A party asserting breach of contract bears the burden of proving all five elements of the claim:

> (1) [T]he existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (citation omitted). When the contract is one of employment, the court will uphold restrictive covenants therein as valid and enforceable when they "(1) are reasonably necessary for the protection of the employer's business, and (2) do not unreasonably restrict the employee's rights and are not prejudicial to the public interest." *Moore Bus. Forms*, 953 F. Supp. at 1062 (relying on Iowa law).

When a party asserts that the contract cannot be enforced due to equitable estoppel, the party asserting equitable estoppel bears the burden of proving four elements. The party must show (1) the nonmoving party made a false representation of or concealed a material fact; (2) the moving party lacked knowledge of truth; (3) the nonmoving party intended that the moving party act on its misrepresentation; and (4) the moving party did in fact rely. *McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 531 (Iowa 2015). The doctrine of equitable estoppel exists to "prevent[ ] one party who has made certain representations from taking unfair advantage of another when the party making the representations changes its position to the prejudice of the party who relied upon the representations." *Id.* (quoting *ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 606 (Iowa 2004)).

### 3. *Analysis*

Here, the Court finds the Mercy Clinic is likely to succeed on the merits of its breach of contract claim because it has shown a "fair chance of prevailing" at trial.[8] *See Planned Parenthood Minn., N.D., S.D.*, 530 F.3d at 732–33. The Court first notes that the parties do not dispute the Employment Agreement's validity or enforceability, and the Court finds no reason to doubt it. The Court will first assess plaintiffs' likelihood of success on its patient inducement claim and then address plaintiffs' noncompete clause claim before turning to defendant's estoppel claim.

### a. *Patient Inducement*[9]

First, the Mercy Clinic has a fair chance of prevailing on its patient inducement claim because it shows a fair chance of success on all five elements of this breach of contract. *See Iowa Arboretum*, 886 N.W.2d at 706.

Here, defendant does not dispute that the Mercy Clinic shows a fair chance of success on the contract's existence, its terms and conditions, and the Mercy Clinic's performance of all terms and conditions required. The parties do not dispute the Employment Agreement or the noncompete clause's validity and enforceability, and neither party calls the terms or conditions, or the Mercy Clinic's performance into question. Thus, the Court finds that the Mercy Clinic shows a fair chance of success on the first three elements.

---

[8] As the Court mentioned at the preliminary injunction hearing, plaintiffs do not focus on defendant's alleged breach of his contract by inducing plaintiffs' employees. Thus, the Court will not address this claim.

[9] The Employment Agreement forbids defendant from "induc[ing]" patients. This is commonly referred to as a patient inducement provision or a nonsolicitation provision. The two terms are functionally indistinguishable. At oral argument, both parties used "induce" and "solicit" interchangeably. Likewise, the Court uses both terms when discussing this provision and defendant's alleged violation.

Defendant does, however, dispute that he breached the contract by soliciting patients and the Mercy Clinic has suffered damages as a result. But the Court finds the Mercy Clinic shows a fair chance of success on proving defendant's breach. Here, defendant sent mailers soliciting "follow up appointments" to "continue" cardiology services for his "existing patients" (Doc. 20-1, at 2), even though defendant's Mercy Clinic patients were the only local patients defendant had before opening his own practice. (Doc. 6-2, at 1–2). A total of forty-nine Mercy Clinic patients have now transferred their records to defendant's clinic. (Doc. 20-1, at 20). Thus, the evidence shows that defendant violated the Employment Agreement's patient inducement provision because he used mailings to induce patients to leave the Mercy Clinic. (*See* Doc. 1-1, at 9 (Employment Agreement, Article X. Covenants, Section B. Patient Inducement)). The Mercy Clinic's evidence also shows that defendant violated the patient inducement provision by advertising via a billboard using his Mercy Clinic photograph. The billboard is directed at the common consumer in the Sioux City area, where the Mercy Clinic is located, in need of cardiovascular services. (*See* Docs. 1, at 1–2, 4; 1-2; 1-3). Thus, its intended audience necessarily includes the Mercy Clinic's patients.

The Court also finds that the Mercy Clinic shows a fair chance of success on proving it suffered damages because of defendant's patient inducement. First, the Mercy Clinic has shown that forty-nine patients have left the Mercy Clinic to obtain services at defendant's clinic instead. (Doc. 20-1, at 20). Thus, the Mercy Clinic has lost all income deriving from these patients. Second, as previously discussed, the Mercy Clinic has shown that defendant's solicitation undermines the goodwill and reputation that the Mercy Clinic built for its cardiology department, in part by investing heavily in advertising defendant's services and building his reputation in the area. (Docs. 6-2, at 1–2; 20-1, at 17). Defendant now trades on the photograph associated with his employment at the Mercy Clinic by using it on the billboard. The Mercy Clinic used the same photograph

when advertising defendant. (Doc. 1, at 5). By advertising using the same photograph for his own profession gain, defendant robs the Mercy Clinic of the goodwill and reputation they fostered by advertising him.

For these reasons, the Court finds the Mercy Clinic shows a fair chance of success on proving all five elements of a breach of contract claim based on patient inducement.

### b.    *Noncompete Clause*

The Mercy Clinic also has a fair chance of prevailing on its noncompete clause claim because it shows a fair chance of success on all five elements of this breach of contract. *See Iowa Arboretum*, 886 N.W.2d at 706.

Here, as with the Mercy Clinic's patient inducement claim, defendant does not dispute that the Mercy Clinic shows a fair chance of success on the contract's existence, its terms and conditions, and the Mercy Clinic's performance of all terms and conditions required. Again, the parties do not dispute the Employment Agreement or the noncompete clause's validity and enforceability, and neither party calls the terms or conditions, or the Mercy Clinic's performance into question. Thus, the Court finds that the Mercy Clinic shows a fair chance of success on the first three elements, and that the Employment Agreement and the provisions within it are valid and enforceable.[10]

---

[10] Even if defendant did not concede the Employment Agreement and noncompete clause's validity and enforceability, the Court would nevertheless find it so. Neither party presents evidence supporting contract invalidity. And the noncompete clause's terms are enforceable. *See Moore Bus. Forms*, 953 F. Supp. at 1062. In fact, the terms of defendant's noncompete clause are modest. Its duration is limited to only twelve months and its geographical radius limited to only forty miles. (Doc. 1-1, at 9, 26); *see also Pro Edge, L.P. v. Gue*, 374 F. Supp. 2d 711, 740–41 (N.D. Iowa 2005) (finding a 250-mile, year-long noncompete clause enforceable). Given the Mercy Clinic's commitment to employing defendant for three years (Doc. 1-1, at 6), the Court would find the noncompete clause reasonably necessary to protect the Mercy Clinic's business. Further, the Court would not find that the noncompete clause unreasonably restricts defendant's rights or is prejudicial to the public interest in receiving medical care because defendant could easily, for instance, open a clinic in nearby Sioux Falls, South Dakota and not run afoul of the provision.

Defendant does, however, dispute he breached the contract by soliciting patients and that the Mercy Clinic has suffered damages as a result. The Court, however, finds that the Mercy Clinic shows a fair chance of success on proving defendant's breach.

Defendant does not dispute that he is providing cardiovascular services in a clinic setting within forty miles of his primary practice location under the Employment Agreement. Further, although the Employment Agreement does not define "primary practice location" (*see* Doc. 1-1), the parties do not appear to dispute that defendant's primary practice location was the Hospital, where the Mercy Clinic is located. (Docs. 1-1, at 11; 6, at 2; 17, at 33–36). (*See also* Employment Agreement, Addendum A – Services, Section I. Clinical Services). Instead, focusing on his administrative responsibilities at the Mercy Clinic, defendant argues that his activity does not violate the noncompete clause because his work is not sufficiently similar to his work at the Mercy Clinic to constitute a "similar position" under the claim. (Doc. 17, at 33–36). Indeed, defendant urges the Court to construe the noncompete clause strictly and narrowly against the Mercy Clinic. (Doc. 17, at 33 (quoting *Cedar Valley Med. Specialists, PC v. Wright*, No. 18-1900, 2019 WL 5063325, at *3 (Iowa Ct. Ap. Oct. 9, 2019)).

Here, defendant's job description and payment history indicate that approximately ninety-five percent of his responsibilities under the Employment Agreement were clinic responsibilities and thus similar responsibilities he has in his new position as an

_____

The Court also notes that although defendant argues that Iowa state-court cases finding a breach of a noncompete clause all involve noncompete clauses "where the doctor agreed not to practice medicine or a particular type of medicine within a defined area" (Doc. 17, at 35), this is not cause to find the Mercy Clinic does not have a fair chance of proving defendant breached the noncompete clause. Although the noncompete clause's phrasing here may be somewhat unusual, the parties agreed to it. Further, even though defendant's cited case law supports enforcing noncompete clauses expressly prohibiting the practice of medicine, defendant offers, and the Court finds, no direction from Iowa Courts to not enforce the noncompete clause or the Employment Agreement here.

interventional cardiologist working in a private cardiology clinic. (Docs. 1-1, at 1–2; 6-4, at 1–17; 6-5, at 1; 20, at 7–8; 20-1, at 1–2, 19). Even interpreting the noncompete clause strictly and narrowly against the Mercy Clinic, as defendant urges, the Court will not require that defendant's new position match his old position working for the Mercy Clinic. Plaintiffs argue that "'similar' does not mean 'identical.'" (Doc. 20, at 7). The Court agrees. The Mercy Clinic's evidence demonstrating a ninety-five percent overlap between defendant's responsibilities at the Mercy Clinic and his clinic shows at least a fair probability that defendant violated the Employment Agreement by competing in a "similar position" by offering clinical cardiology services within forty miles of the Mercy Clinic. (*See* Doc. 1-1, at 9 (Employment Agreement, Article X. Covenants, Section C. Not to Compete)). Thus, the Court finds that the Mercy Clinic shows a fair chance of success of proving defendant's breach.

The Court also finds that the Mercy Clinic shows a fair chance of success on proving it suffered damages because of defendant's competition. First, as already discussed in the context of patient inducement, the Mercy Clinic has shown that forty-nine patients have left the Mercy Clinic for defendant's clinic (Doc. 20-1, at 20), leading to the Mercy Clinic's loss of income from those patients and the benefit of their word-of-mouth. Second, also previously discussed, the Mercy Clinic has shown that defendant's competition and his related solicitation of Mercy Clinic patients undermines the Mercy Clinic's goodwill and reputation. (Docs. 6-2, at 1–2; 20-1, at 17). Thus, the Court finds the Mercy Clinic shows a fair chance of success of proving damages related to defendant's breach.

### c. *Equitable Estoppel*

The Court finds defendant has not shown that the Mercy Clinic should be estopped from enforcing the noncompete clause. The doctrine of equitable estoppel is not applicable here because defendant does not show that the Mercy Clinic took unfair

advantage of defendant such that this Court must intervene in equity. *See McKee,* 864 N.W.2d at 531. Specifically, defendant does not show even the first element of equitable estoppel—here, that the Mercy Clinic made a false representation of or concealed a material fact. *See id.*

Defendant argues that Mr. Daugherty told him he could open a competing clinic within the forty-mile service area, suggesting that the Mercy Clinic is bound by Mr. Daugherty's words. (Doc. 17, at 37). But this argument fails for two reasons. First, Mr. Daugherty cannot bind the Mercy Clinic. Mr. Daugherty is not and was not employed by the Mercy Clinic. (Docs. 6-3, at 1; 20-1, at 15–16). A stranger to a contract, by definition having no rights under the contract, cannot alter it. *See ITT Hartford Life & Annuity Ins. Co. v. Amerishare Invs., Inc.*, 133 F.3d 664, 669 (1998). Here, Daugherty could not bind the Mercy Clinic even if he wanted to, because his employer—Mercy One—was neither a party to nor an intended beneficiary of the Employment Agreement.[11] (*See* Doc. 1-1). Second, Mr. Daugherty states that he never told defendant he could open a competing clinic without consequence. (Doc. 20, at 15–16). In short there is a factual dispute that prevents defendant's claim. Thus, defendant's affirmative defense of equitable estoppel fails on the first element, and the noncompete clause is enforceable. The Court, therefore, does not reach the other elements of estoppel, or plaintiffs' second argument.[12]

---

[11] As discussed above, the Court does not reach the question of whether MercyOne has a legal right to benefits stemming from the Employment Agreement such that it is a proper party to this suit. But this question is adjacent to the question of whether MercyOne is a party or an intended beneficiary on the Employment Agreement. Here, the Employment Agreement's terms are clear. (Doc. 1-1, at 1, 11 (listing parties and foreclosing possibility of third-party beneficiaries)). The Court notes that Beth Hughes, who signed the Employment Agreement on behalf of "Employer"—that is, the Mercy Clinic—is both President of MercyOne and President of the Mercy Clinic. (Doc. 20-1, at 17).

[12] Because defendant raised Mr. Daugherty's alleged approval, the Court also notes that additional evidence shows defendant knew the terms of the noncompete clause and their resulting

In sum, the Court finds the likelihood of success on the merits favors injunction.

### C.   Balance of Harms

The Court finds the balance of the harms favors injunction.

#### 1.   Arguments

Plaintiffs argue that the balance of the harms favors injunction because no cognizable harm would befall defendant if the Court issued an injunction, given that defendant has no legal right to provide the services that the Court would be enjoining. (Doc. 6, at 16).

Defendant argues that plaintiffs allege no irreparable harm, as already discussed, although defendant would not be able to practice if the Court granted a preliminary injunction.[13] (Doc. 17-1, at 28–29). Defendant asserts that no hospital will hire him "as long as the DOJ inquiry remains open." (*Id.*, at 29). Finally, defendant argues that the Court should interpret the Mercy Clinic's termination of defendant against granting an injunction. (*Id.*, at 28 (quoting *Ma & Pa, Inc. v. Kelly*, 342 N.W.2d 500, 502 (Iowa 1984)).

#### 2.   Applicable Law

"[T]he balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties,

---

limitations. Specifically, defendant requested that the Mercy Clinic not enforce the noncompete clause. (Doc. 20, at 12–13). Thus, even if Mr. Daughtery's representation could bind the Mercy Clinic, defendant's argument would nevertheless fail because the evidence does not show that defendant lacked knowledge of the truth—that is, that the noncompete clause would be enforced. *McKee v. Isle of Capri Casinos, Inc.,* 864 N.W.2d 518, 531 (Iowa 2015).

[13] Defendant argues that his practice benefits MercyOne by referring patients for procedures at the Hospital. (Doc. 17, at 27). As discussed above, however, defendant argues that MercyOne is not a proper party, and that the Court should not consider the effects of defendant's behavior on MercyOne in determining irreparable harm. If that is so, then it is equally inappropriate for the Court to consider the possible benefit MercyOne may receive from referrals.

including the public." *Wachovia Secs., L.L.C.*, 571 F. Supp.2d at 1047. It is not the same analysis as the irreparable harm analysis. *Id.* The balance of harms analysis considers several factors including the threat of each parties' rights that would result from granting or denying the injunction, the potential economic harm to the parties, and whether the defendant has taken voluntary remedial action. *Id.* "[A]n illusory harm to the movant will not outweigh any actual harm to the non-movant." *Frank N. Magid Assocs., Inc. v. Marrs*, No. 16-CV-198-LRR, 2017 WL 3091457, at *5 (N.D. Iowa Jan. 9, 2017) (quoting *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 976–77 (N.D. Iowa 2006)).

### 3. Analysis

The Court begins by noting that the relevant harms are those that would result from issuance of an injunction—not the harms that have befallen the parties from other sources. Although defendant's employment opportunities may be complicated because he is under civil investigation by the Department of Justice (Doc. 17, at 28–29), this is not relevant to the Court's decision. That complication is not the result of an injunction. In any event, it is largely speculative; defendant believes he will encounter difficulty obtaining privileges at another area hospital because of the pall of a civil investigation hanging over him, but he made no showing that he unsuccessfully attempted to do so.

Additionally, the Court notes that an injunction will not enjoin defendant "from practicing medicine altogether," as defendant argues. (*Id.*, at 28). By its terms, as defendant notes (*See id.*, at 35), the noncompete clause does not prevent defendant from practicing medicine. Instead, it prevents defendant from having a similar position within forty miles within twelve months from his termination. (Doc. 1-1, at 3).

Here, no cognizable harm would befall defendant if the Court issues an injunction barring him from inducing patients away from the Mercy Clinic because he has no legal right to do so under the Employment Agreement. (*See* Doc. 1-1, at 9 (X. Covenants)).

To be sure, defendant argues that he has not violated the Employment Agreement's covenants by inducing patients away from the Mercy Clinic. (Doc. 17, at 30–36). If that is so, then defendant should have no issue with an injunction prohibiting him from doing something he is not doing. In the preliminary injunction hearing, defendant countered by arguing that a court order would be duplicative of the Employment Agreement covenant. The Court disagrees. As the Court noted, the power of the Court's order extends beyond the Employment Agreement and its enforcement. Were defendant to violate this Court's order, contempt proceedings would follow. Defendant further argues that a court order would chill him from engaging in any conduct that may constitute an inducement of a patient away from the Mercy Clinic. That is as it should be when, as here, the Court finds that the Mercy Clinic is likely to prevail on the enforceability of the Employment Agreement covenant barring defendant from inducing patients away from the Mercy Clinic.

The Court distinguishes *Ma & Pa*, a 1984 Iowa case on which defendant relies. First, the facts here are critically different. The *Ma & Pa* Court cited several cases outside of Iowa in which courts found that termination by employer is a factor weighing against a grant of injunction.[14] 342 N.W.2d at 502. Applying the *Ma & Pa* principle, the Court focused on the "severe hardship" to the defendant, who had been fired from his job as an at-will petroleum salesman during a recession and began to sell petroleum independently after his termination. *Id.*, at 501–502. Here, defendant, an experienced cardiologist, alleges no comparable financial hardship that would stem from an injunction. Indeed, the Court notes, it would be difficult to do so, considering that, under

_____

[14] Elsewhere, plaintiffs cite *Cogley Clinic v. Martini* as not considering termination by employer when determining whether an injunction is appropriate. (Doc. 6, at 13). To be sure, the *Cogley Clinic* Court did not discuss termination by employer as a factor and, at least arguably, did not discuss balance of the harms. *See Cogley Clinic v. Martini*, 112 N.W.2d 678, 679–83 (Iowa 1962); *id.* at 551–55 (J. Hays, dissenting).

the Employment Agreement, defendant was paid more than $6.5 million dollars over two-and-a-half years and his noncompete clause is limited to a term of twelve months. (Docs. 1-1, at 9, 17–20; 6-2, at 1). Further, as above, defendant's difficulty to obtain employment is largely speculative. Defendant believes he will encounter difficulty obtaining employment elsewhere, but has not shown evidence of actually having encountered such difficulty. Second, at most, the hardship of defendant's inability to obtain employment after an injunction is a factor the Court takes into consideration when balancing the harms. *See Uncle B's Bakery, Inc. v. O'Rourke*, 938 F. Supp. 1450, 1461 (N.D. Iowa 1996) (finding "the key" to *Ma & Pa*'s decision, and others like it, is "not 'hardship' or 'oppression' to the restricted employee, but a balance of that harm against the potential harm to the employer"). The Court finds, however, that the Mercy Clinic's harm absent an injunction would outweigh any harm to defendant.

Indeed, harm would certainly befall the Mercy Clinic if the Court decides not to issue an injunction. As above, the evidence shows that the Mercy Clinic has already lost forty-nine of its clients to defendant's clinic (Doc. 20-1, at 20) since he began soliciting existing patients with direct mailings (Docs. 6-5, at 1; 20-1, at 1–2), with thirty-nine clients transferring between the plaintiffs' motion and reply brief. (Docs. 6, at 14; 20-1, at 20). Further, because defendant does not believe he is breaching the Employment Agreement's covenants (Doc. 17, at 30–36), it appears defendant will not cease this behavior absent the issuance of an injunction.

Further, the Mercy Clinic will suffer harm from defendant providing cardiology care in close proximity to the Mercy Clinic regardless of whether defendant induces patients away from the Mercy Clinic. As noted, defendant is trading on the reputation and goodwill that the Mercy Clinic helped him establish as part of his employment with the Mercy Clinic to now directly compete with the Mercy Clinic in its territory. In

contrast, defendant can establish a cardiology clinic outside the forty-mile radius of the noncompete clause.

In sum, the Mercy Clinic's loss of patients, goodwill, and reputation are ongoing harms that weigh in favor of issuing an injunction. Thus, the Court finds the balance of harms favors injunction.

### D.    *Public Interest*

The Court finds the public interest is a neutral factor.

#### 1.    *Arguments*

Plaintiffs argue that public interest calls for the enforcement of valid noncompete clauses that honor the parties' intentions in their agreement to accept certain burdens and benefits. (Doc. 6, at 16–17).[15]

Defendant argues that the relevant interests are "not enforcing invalid noncompetition agreements," and "accessible healthcare." (Doc. 17-1, at 38). Defendant, however, develops his argument about providing accessible healthcare. (*See id.*). Defendant argues that the Sioux City area is better served by having more practicing physicians. (*Id.*). Further, he distinguishes *Cogley Clinic v. Martini*, on which plaintiffs rely, as inapposite. (*Id.* (discussing *Cogley Clinic v. Martini*, 112 N.W.2d 678 (Iowa 1962)). The *Cogley Clinic* Court found enjoining the defendant—the community's only orthopedic specialist—from practicing medicine was appropriate because he refused to make himself available to patients and was "not helping the community." *Cogley Clinic*,

---

[15] In their reply, plaintiffs argue that defendant's willingness to expose plaintiffs to liability based on his alleged false claims is another public interest factor that the Court should consider. (Doc. 20, at 22). Plaintiffs, however, did not raise this argument in their original briefing. (*See* Doc. 6, at 16–17). Per Local Rule 7g, the Court may only consider a party's reply to newly-decided authority or new and unanticipated arguments—not new arguments. Thus, the Court cannot consider plaintiffs' argument about liability based on defendant's alleged false claims. This argument, however, would not change the Court's decision.

112 N.W.2d at 679–83. In contrast, defendant asserts he is an asset to the community. (Doc. 17, at 39).[16]

### 2. *Applicable Law*

This Court has noted as follows:

> The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious. However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve [and] a preference for enjoining inequitable conduct[.]

*Prudential Ins.*, 728 F. Supp. 2d at 1032 (internal citations omitted). Relevant public interest factors include enforcing valid contracts, including valid noncompete clauses, *N.I.S. Corp.*, 724 F.2d at 710, and providing "sufficient [community] health care." *Bd. Regents v. Warren*, No. 08-0017, 2008 WL 5003750, at *3 (Iowa Ct. App. Nov. 26, 2008).

### 3. *Analysis*

The Court finds that public interest is served in the enforcement of valid contracts and noncompete clauses, and here the parties do not dispute that the Employment Agreement and noncompete clause are valid. The Court also finds, however, that public interest is served by increasing the availability of qualified medical providers in the Sioux City area.

The Court notes that the defendant lists "not enforcing invalid noncompetition agreements" as his first interest. (Doc. 17, at 36). Defendant, however, does not mention the terms "invalid" or "invalidity" elsewhere and does not appear to actually

---

[16] Defendant also argues he is an asset to plaintiffs. (Doc. 17, at 39). The Court assumes this refers to defendant's previous argument that his clinic will benefit MercyOne financially. As the Court has explained, however, the Court focuses on harms to the Mercy Clinic in this order. Thus, the Court will not consider this argument.

argue invalidity here.[17]  To be sure, defendant cites noncompete clauses restricting the very practice of medicine that courts have upheld as valid and raises no reason to find the noncompete clause here as invalid.  (*Id.*, at 35).  Thus, the Court interprets defendant's first interest as the interest of limiting noncompete clauses to their stated terms.  Here, the Court agrees with defendant that noncompete clauses, like any contractual agreement, should generally be construed according to their stated terms.  The Court finds that Mercy Clinic seeks to enforce the noncompete clause within its stated terms—that is, preventing (1) defendant's solicitation of Mercy Clinic patients within twelve months of the end of his Employment Agreement—here, his termination, and (2) defendant's practice of a similar position within twelve months of his termination and within forty-miles of the Mercy Clinic.  Thus, the Court finds that the public interest is served by enforcing the valid noncompete clause to the extent of its terms.

The Court also finds that it is in the public interest that area residents have access to quality medical services, and it also appears undisputed that defendant is a respected and capable cardiologist.  Plaintiffs do not appear to dispute this.

Thus, the Court finds the public interest favors neither party.  Here, there are competing public interests and the Court finds neither significantly outweighs the other.

---

[17] Further, the only other point in defendant's brief that mentions the contract's "validity" is in defendant's argument that plaintiffs are estopped from enforcing the Employment Agreement, including the noncompete clause.  (Doc. 17, at 36).  Defendant notes "parties to a *valid* contract may estop themselves from asserting any right under the contract."  (*Id.* (emphasis added quotation marks omitted)).  In other words, to be estopped from asserting a right, the underlying contract providing that right must be valid.  Thus, defendant appears to argue that the Employment Agreement and noncompete clause are valid, but plaintiffs are estopped from their enforcement.  This argument would directly contradict any invalidity argument defendant might make in his public interest discussion.
Finally, to the extent that defendant might intend to argue invalidity, the Court has already explained that it would find the noncompete clause valid were that question at issue here.

## IV.    CONCLUSION

For the reasons stated above, the Court finds in favor of plaintiffs and reiterates here from its order at Doc. 22 the following:

Until November 13, 2022, or trial (whichever comes first), the Court prohibits defendant from directly or indirectly, whether as an individual, advisor, employee, agent or otherwise, taking any action to induce any patient to discontinue services from plaintiffs.

Until November 13, 2022, or trial (whichever comes first), the Court prohibits defendant from engaging in a similar position (meaning defendant cannot provide cardiology services or treatment) within forty miles of defendant's former primary practice location (the Mercy Clinic).

**IT IS SO ORDERED** this 12th day of January, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

33